1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**

10

EASTERN DISTRICT OF CALIFORNIA

11
12

LINDA ELAINE CALISTI,

Case No.  1:14-cv-02000-SKO

13

Plaintiff,

**ORDER AFFIRMING THE ALJ'S DECISION**

14

v.

(Doc. No. 1)

15
16

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

17
18

Defendant.

19

_____

20

**INTRODUCTION**

21

        Plaintiff Linda Elaine Calisti ("Plaintiff") seeks judicial review of a final decision of the

22

Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application

23

for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to

24

Titles II and XVI of the Social Security Act.  42 U.S.C. §§ 405(g); 1383.  The matter is currently

25

before the Court on the parties' briefs, which were submitted, without oral argument, to the

26

Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

27
28

_____

[1]  The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 7, 8.)

1

**FACTUAL BACKGROUND**

2      Plaintiff filed an application for DIB on March 29, 2012, and for SSI on April 17, 2012,

3   alleging disability beginning on June 9, 2010, caused by Grave's Disease, Hepatitis C, Post-

4   Traumatic Stress Disorder ("PTSD"), and Obsessive Compulsive Disorder ("OCD").

5   (Administrative Record ("AR") 278.)

6   **A.      Relevant Evidence**

7      Plaintiff sought treatment for anxiety and depression at the River Valley Primary Care

8   ("River Valley") facility in Arkansas.  (AR 571-91.)   In December 2009, she reported the recent

9   death of a friend, and that she was experiencing problems with her temper and felt hopeless.

10  (AR 575.)  She was continued on her prescription for Lexapro.  (AR 576.)  In January 2010, she

11  followed-up at River Valley and indicated she did "not get her unemployment," but reported she

12  had been to a psychiatrist about a disability determination the previous day.  (AR 574.)  She

13  appeared stressed and unable to sit still; it was noted she had not taken her Seroquel prescription

14  that day, although she had been taking it every night since she picked it up.  (AR 574.)  She also

15  indicated she had run out of her prescription for Paxil.  (AR 574.)  In February 2010, Plaintiff

16  returned again to River Valley for a follow-up appointment, and it was noted that she came in to

17  order more Seroquel, but she had no money and stated she would come back.  (AR 574.)  On

18  March 30, 2010, Plaintiff was a "no-show" for her appointment.  (AR 574.)

19     In May 2010, she returned to River Valley for a follow-up.  (AR 572-73.)  She reported

20  she had stopped Seroquel because she did not like that she was eating all the time as a side effect.

21  (AR 573.)  She denied any depression and only minimal anxiety, although she was noted to be

22  hyperactive and agitated.  (AR 573.)

23     Plaintiff sought treatment at Denton County, Texas, MHMR Center.  (AR 501-50.)  At an

24  examination in November 2010, she reported anxiety and depression and indicated she had

25  previously been prescribed Paxil and Seroquel, but neither of those medications worked for her.

26  (AR 530.)  Plaintiff was prescribed Prozac, Restoril, Buspar, and Levoxyl (AR 541); at her next

27  appointment she reported the medications had decreased her symptoms, and she was noted to be

28  clinically improving (AR 442-43).

On December 21, 2010, she again reported to her treating physician at Denton County MHMR that she was taking her medication as prescribed (AR 504), and it was noted she was stable beyond being upset about her daughter who had stolen money from her (AR 505).

On January 31, 2011, state agency physician John Ferguson, Ph.D., reviewed Plaintiff's medical records and completed a Mental Residual Functional Capacity ("MRFC") form.  (AR 492-94.)[2]  He checked boxes indicating moderate limitations in Plaintiff's ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and to respond appropriately to changes in the work setting.  (AR 493.)  In the report, Dr. Ferguson provided a narrative of his opinion:

> Claimant retains the ability to understand, remember and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in routine work settings.
>
> The claimant does have more than minimal limitations associated with her conditions; however, these limitations do not wholly compromise her functional abilities.  The alleged limitations caused by the claimant's symptoms are partially supported by [evidence of record].

(AR 494.)

On July 21, 2012, Plaintiff was seen by Deborah DiGiaro, Ph.D., for a comprehensive psychiatric evaluation.  (AR 594-98.)  Plaintiff was driven to the appointment by a friend, and was able to complete the psychiatric questionnaire at Dr. DiGiaro's office in a "detailed manner." (AR 594.)   Plaintiff described several childhood and adult stressors that contributed to her depression and anxiety, she reported no history of psychiatric hospitalizations or suicide attempts, and she indicated she was seen for counseling in 2010 but it had resulted in no significant improvement of her symptoms.  (AR 595.)

---

[2] Dr. Ferguson's January 31, 2011, MRFC form pre-dates Plaintiff's current application for DIB and SSI.  It appears this opinion was associated with a prior application for benefits, but the record does not reflect any prior claims Plaintiff made for DIB or SSI.  Nonetheless, the opinion relates to Plaintiff's condition during the relevant period.

1    Plaintiff reported daily activities including her personal care, light shopping and cooking,

2   laundry, and caring for her dog.  (AR 596.)  She also watches TV, and she likes artwork hobbies

3   but lacks the funds for the supplies.  (AR 596.)  Dr. DiGiaro described Plaintiff as neatly and

4   casually dressed with good hygiene.  Her motor activity was within normal limits, she maintained

5   good eye contact, but she was irritable and angry about the evaluation because she had done it

6   before.   Dr. DiGiaro noted Plaintiff "is not dumb, and she can add and subtract and be retrained.

7   She thought that the questions were purposeless for her."  (AR 596.)  Her mood was angry and

8   depressed.  (AR 597.)  Dr. DiGiaro diagnosed major depression and a personality disorder and

9   assigned her a Global Assessment of Functioning ("GAF") score of 60.[3]  Dr. DiGiaro provided the

10  following discussion:

> This is a claimant who has had depression on and off for the last 19 years due to
> multiple external factors with [a] history of sexual abuse and abusive
> relationship[s].  She has difficulty getting along with others due to emotionality.
> She has difficulty maintaining relationships.  She is emotionally over[-]reactive.
> She has [a] history of conduct disorder during childhood.  She has had psychiatric
> treatment in Texas by County Mental Health with some improvement.  She has
> been diagnosed with major depression at that setting.  She continues to have
> depressed mood complicated by underlying personality issues, which contribute to
> her mood instability and difficulty with relationships at work and in her personal
> life.  Her prognosis is fair.

17  (AR 598.)  Dr. DiGiaro opined Plaintiff is able to manage her own funds; perform simple and

18  repetitive tasks; detailed and complex tasks; accept instructions from supervisors; and work on a

19  consistent basis without special or additional instructions.  Plaintiff's ability to interact with co-

20  workers and the public is mildly impaired.  Plaintiff is moderately impaired in her abilities to

21  maintain regular attendance in the workplace; complete a normal workday or workweek without

22  interruptions from a psychiatric condition; and deal with stress encountered in a competitive work

23  environment.  (AR 598.)

---

[3] The GAF scale is a tool for "reporting the clinician's judgment of the individual's overall level of functioning."  Am. Psychiatric Ass'n, Diagnosis & Statistical Manual of Mental Disorders 32 (4th ed. 2000).  The clinician uses a scale of zero to 100 to consider "psychological, social, and occupational functioning on a hypothetical continuum of mental health- illness," not including impairments in functioning due to physical or environmental limitations.  *Id.* at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

In April 2013, state agency non-examining physician E. Aquino-Caro, M.D., reviewed Plaintiff's record and completed an MRFC form.  (AR 156-58.)  He noted moderate limitations in Plaintiff's abilities to remember or carry out detailed instructions, work in coordination with others without being distracted by them, interact with the general public, get along with co-workers or peers, and respond appropriately to supervisors.  (AR 157.)  He noted no adaptation limitations such as the ability to respond to changes in work setting, be aware of normal hazards and take precautions, to travel in unfamiliar places or use public transportation, or to set realistic goals and make plans independent of others.  (AR 158.)  He opined in narrative form that, despite any moderate limitations noted, Plaintiff retained the ability to perform simple, repetitive tasks with limited public contact.  (AR 157-58.)

**B.      Plaintiff's Disability Report Statements**

On June 6, 2012, Plaintiff completed an adult disability report which asked various questions about her conditions, symptoms, and activities.  (AR 296-303.)  She reported she cared for a small dog, and considered him her "mental companion."  (AR 297.)  Her sleeping is disturbed; sometimes she does not sleep at all and other times she sleeps for "days at a time." (AR 297.)  She performs minimum household duties, preparing food only when she feels hungry. (AR 298.)  She is easily sidetracked and it takes her too long to do simple chores.  (AR 298.) Being in crowds "bothers" her, and she has no patience to wait in lines at checkouts.  (AR 299.) Her balance is "bad" and she falls, she can walk only about one half block before needing to rest, her attention span is short, and she sometimes quits something she has started before she is finished.  (AR 301.)  She does not handle stress or changes in her routine well.  (AR 302.)

**C.      Administrative Proceedings**

The Commissioner denied Plaintiff's application initially and again on reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 77-102, 129-60, 185-89, 197-99.)  A hearing was held on June 26, 2014, before an ALJ.  (AR 30-76.)

**1.      Plaintiff's Hearing Testimony**

Plaintiff testified she currently lives in a tent in the backyard of a friend, and she has a dog. (AR 35.)  She has a driver's license but not a car, so she takes public transportation to get around.

(AR 39.)  She attended cosmetology school in Kansas, but she was involved in a car accident and could not finish the schooling because of pain in her back.  (AR 39.)  Currently she is prevented from working because she "can't deal with people."  (AR 47.)  She has anxiety issues, avoids confrontation and pressure, and she does not like to work with the public at all.  (AR 47.)  She cannot control her temper and she becomes emotional.  (AR 47.)  She is seeing a psychologist for these issues, hoping that it will help.  (AR 47.)

She had interferon treatment for her Hepatitis C, but she did not complete the treatment so she believes she will have to go through it again in the future.  (AR 48.)  She still experiences symptoms from the Hepatitis C including joint aches and pains, feeling worn out, and bloating.  (AR 51.)

She experiences headaches three times per week for which she takes Imitrex.  (AR 51.)  Her headaches last up to a week, and she experiences them about two to three times per week.  (AR 52.)  When she has a migraine, she lies down or sits in a reclined position, she tries to use ice and put it on her head, she takes hot tea, and she tries baths.  (AR 53.)

She often has panic attacks, sometimes three or four per day.  (AR 48.)  Her medication was just changed to Xanax to see if that would help.  (AR 48.)  When she experiences a panic attack, she runs off, cries, and hugs her dog.  (AR 48.)  Sometimes she experiences a "spinning" feeling, falls for no reason, and hurts herself.  (AR 49.)  Her panic attacks are triggered by different things such as sirens.  (AR 50.)  She was in a tornado in the past and ever since then sirens trigger panic attacks.  (AR 50.)  These attacks last about a half hour with three or four occurrences on some days.  (AR 50.)

She has neck pain caused by a disc problem.  The pain moves up the back of her neck and runs through the back of her head.  (AR 53.)  She also has pain in her wrists which runs all the way to her elbows and feels like she is having a heart attack.  (AR 53.)  Her lower back also causes her pain, particularly if she lies down too long, moves around, or sits too much.  (AR 53.)

She has stomach problems from colitis and she has to be careful what she eats.  Hemorrhaging sometimes results from her colitis problem, and she is then required to go to the hospital.  (AR 54.)  She also has pain in her hips, knees, and other joints because of the Hepatitis,

1   but also because her thyroid has been removed.  (AR 54.)  She does not absorb calcium anymore,

2   which causes her bones to thin.  (AR 54.)  She takes Norco for her joint pain, but it sometimes

3   causes her stomach to become upset.  (AR 56.)

4       In describing a "normal" day, Plaintiff indicated she does not sleep much.  (AR 57.)  When

5   she wakes, she takes her thyroid medication, has a cup of coffee, spends time with her dog,

6   watches television, straightens out her tent, takes a nap and does as little as possible.  (AR 57.)

7   She does only light housework such as dishes and some laundry, but no yardwork.  Socially, she

8   attends church "every now and then," but that is "about it."  (AR 59.)  She sees a counselor once a

9   week and her physician once a month if something is wrong.  (AR 59.)

10       **2.**        **Testimony of Vocational Expert at the Hearing**

11       At the hearing, the ALJ solicited testimony from a Vocational Expert ("VE") about

12   Plaintiff's past work and her ability to perform other work.  (AR 61-68.)  The VE testified Plaintiff

13   had four jobs in the past 15 years.  (AR 64.)  The VE characterized the first job as that of a fast

14   food cook, Dictionary of Occupational Titles ("DOT") 313.374-010, a short order cook, DOT

15   313.374-014; a kitchen helper, DOT 318.687-010; and as an oven operator, DOT 526.685-070.

16   (AR 65-66.)

17       The ALJ then posed a series of hypotheticals for the VE to consider.  The ALJ asked the

18   VE to consider a person of the same age, education, and experience in background as Plaintiff for

19   each hypothetical.  (AR 67.)  In the first hypothetical, the ALJ asked the VE to consider a person

20   who could lift up to 50 pounds occasionally, and 25 pounds frequently; stand or walk for

21   approximately six to eight hours; sit for approximately six to eight hours; is limited to simple,

22   repetitive tasks, only occasional interaction with co-workers and supervisors, must also avoid

23   temperature extremes; can frequently climb ramps, stairs, ladders, ropes, and scaffolds; can

24   frequently balance, stoop, kneel, crouch, and crawl, and can frequently engage in bilateral

25   handling; but should avoid concentrated exposure to workplace hazards such as unprotected

26   machinery, unprotected heights, and uneven and slippery terrain.  (AR 67-68.)  The VE testified

27   that the limitation for temperature extremes would preclude Plaintiff's past work as it related to

28   ovens, but there were other work that such an individual could perform including hand-packager,

1  DOT 920.587-018, which would need to be reduced by 50% to account for environmental

2  limitations; as a marker, DOT 369.687-026, with a 50% erosion; and as a garment bagger, DOT

3  920.687-018, with a 50% erosion due to environmental hazards.  (AR 70.)

4       In a second hypothetical, the ALJ asked the VE to consider an individual with the same

5  limitations as described in the first hypothetical, but with a reduced lifting capacity of 20 pounds

6  occasionally, and up to 10 pounds frequently.  (AR 71.)  The VE testified such a person could not

7  perform Plaintiff's past relevant work, but could perform other alternative work as a garment

8  sorter, DOT 222.687-014.  (AR 72.)

9       The ALJ posed a third hypothetical which assumed the same limitations as the first

10  hypothetical, but included a limitation to sedentary work only.  (AR 72.)  The VE testified such a

11  person could not perform Plaintiff's past relevant work, but could perform alternative work as an

12  assembler, DOT 734.687-018; a leaf tier, DOT 529.687-138; and as a packaging hand bander,

13  DOT 920.687-030.

14       The ALJ posed a fourth hypothetical asking the VE to consider a hypothetical individual

15  who could rarely lift more than 15 pounds in an eight-hour day, and occasionally lift 15 pounds;

16  must be allowed to lie down or recline about three hours in an eight-hour day, sit up to one hour at

17  a time within an eight-hour day; must be allowed to take unscheduled work breaks at least two to

18  three times within an eight-hour day for a duration of 10 to 15 minutes each; can engage in

19  occasional handling fingering, overhead reaching; and may be absent from work five days or more

20  per month on average.  (AR 73-74.)  The VE testified such a person could not perform Plaintiff's

21  past work or other alternative work.  (AR 74.)

22       Plaintiff's counsel asked the VE to clarify whether the hand packer job the VE testified

23  could be performed by someone with the limitations described in the first hypothetical required

24  someone to frequently or constantly engage in bilateral handling.  (AR 74.)  The VE responded

25  that in his experience, bilateral handling could be required up to six hours a day, which would

26  qualify as constant, but that would be different from what the DOT states are the typical job

27  requirements.  (AR 74-75.)  Plaintiff's counsel posed a hypothetical, asking the VE to consider a

28  person who was moderately impaired in the ability to maintain regular attendance in the

workplace, complete a normal workweek without interruptions, and deal with stress encountered in a competitive environment.  (AR 75.)  Plaintiff's counsel defined moderate limitation as being off-task 10% of the time, and the VE testified that such a person would not be able to complete Plaintiff's past relevant work or any other alternative work.  (AR 75.)

### 3.    The ALJ's Decision

On August 1, 2014, the ALJ issued a decision, finding Plaintiff not disabled from June 9, 2010, through the date of decision.  (AR 12-23.)  Specifically, the ALJ found that Plaintiff (1) had not engaged in substantial gainful activity since her alleged onset date of June 9, 2010 (AR 14); (2) had severe impairments including major depressive disorder, recurrent, severe without psychosis, anxiety disorder, chronic pain syndrome, osteoarthritis, and migraine headaches (AR 14); (3) did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1  (AR 15); and (4) had the residual functional capacity ("RFC")[4] to perform medium exertional level work, and had the ability to lift and carry up to 50 pounds occasionally, and 25 pounds frequently; stand, walk, and sit approximately six to eight hours; frequently climb, balance, stoop, kneel, crouch, crawl, and engage in bilateral handling, but must avoid temperature extremes, concentrated exposure to excessive noise, workplace hazards such as dangerous machinery, unprotected heights, and uneven or slippery terrain; and she is limited to simple, repetitive tasks without any public contact and with only occasional interaction with co-workers or supervisors.  (AR 16.)  The ALJ found that Plaintiff was unable to perform her past relevant work (AR 21), but she retained the ability to perform other work such as a hand packager, marker, and garment bagger.  (AR 22).  The ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act at any time from June 9, 2010, through the date of decision.  (AR 23.)

Plaintiff sought review by the Appeals Council on August 22, 2014.  (AR 13-16.)  The Appeals Council denied Plaintiff's request for review on October 29, 2014.  (AR 1-6.)  Therefore,

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  Social Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*

1   the ALJ's decision became the final decision of the Commissioner.   20 C.F.R. §§ 404.981;

2   416.1481.

3   **C.      Plaintiff's Argument on Appeal**

4          On December 16, 2014, Plaintiff filed a complaint before this Court seeking review of the

5   ALJ's decision.  Plaintiff argues the ALJ failed to incorporate limitations opined by Drs. Ferguson

6   and DiGiaro, and also asserts the ALJ failed to state clear and convincing reasons to discredit her

7   symptom testimony.

8                                **SCOPE OF REVIEW**

9          The ALJ's decision denying benefits "will be disturbed only if that decision is not

10   supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599,

11   601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its

12   judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).

13   Instead, the Court must determine whether the Commissioner applied the proper legal standards

14   and whether substantial evidence exists in the record to support the Commissioner's findings.  *See*

15   *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).   "Substantial evidence is more than a mere

16   scintilla but less than a preponderance."  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th

17   Cir. 2008).   "Substantial evidence" means "such relevant evidence as a reasonable mind might

18   accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

19   (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).   The Court "must

20   consider the entire record as a whole, weighing both the evidence that supports and the evidence

21   that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a

22   specific quantum of supporting evidence."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir.

23   2007) (citation and internal quotation marks omitted).

24                                **APPLICABLE LAW**

25          An individual is considered disabled for purposes of disability benefits if he or she is

26   unable to engage in any substantial, gainful activity by reason of any medically determinable

27   physical or mental impairment that can be expected to result in death or that has lasted, or can be

28   expected to last, for a continuous period of not less than twelve months.   42 U.S.C.

§§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).   The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy.   42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability.   In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§ 404.1520(b), 416.920(b).   If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities.   *Id*. §§ 404.1520(c), 416.920(c).   If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"),   20 C.F.R. 404, Subpart P, App. 1.   *Id*. §§ 404.1520(d), 416.920(d).   If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform her past work.   *Id*. §§ 404.1520(f), 416.920(f).   If not, in the Fifth Step, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy.   *Id*. §§ 404.1520(g), 416.920(g).   If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps.   *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## DISCUSSION

### A.    The ALJ's RFC Assessment Encompassed All of Plaintiff's Limitations

Plaintiff argues the ALJ failed to incorporate several limitations opined by Drs. DiGiaro and Ferguson.   Specifically, Dr. DiGiaro found Plaintiff moderately limited in her ability to maintain attendance, complete a normal workday without interruptions from a psychiatric

condition, and deal with stress.  Although the ALJ included a limitation for simple, repetitive work in the RFC, this does not adequately capture the limitations opined by Dr. DiGiaro.  Also, state agency non-examining physician, Dr. Ferguson, found Plaintiff has adaptation limitations, but nothing in the RFC adequately captures these limitations.  The work identified by the VE requires the ability to manage some form of change in terms of work duties.  A moderate limitation in Plaintiff's ability to adapt to change – as opined by Drs. DiGiaro and Ferguson – would impact Plaintiff's ability to perform the identified jobs; thus, the ALJ's failure to incorporate the limitations into the RFC was material to the disability determination.

The Commissioner argues the ALJ's RFC assessment need only be *consistent* with the physician's assessed limitations, not *identical* to them.  The ALJ in this case translated the moderate limitation opined by Dr. DiGiaro into a concrete functional limitation to simple, repetitive work without any public contact and only occasional interaction with co-workers and supervisors.  In other words, the ALJ synthesized the medical evidence into an RFC that accommodated the limitations stemming from Plaintiff's medical conditions.  Regarding Dr. Ferguson, the Commissioner contends the ALJ was not required to identify explicitly in her RFC the "moderate" adaptation limitations Dr. Ferguson assessed in completing the mental residual functional capacity form.  The Commissioner further argues the narrative portion of Dr. Ferguson's report does not contain any adaptation limitations.

### 1.     The Adaptation Limitation Opined by Dr. Ferguson

On January 31, 2011, Dr. Ferguson completed an MRFC form in assessing Plaintiff's mental functional abilities.  (AR 492-94.)  The MRFC's Section I is comprised of check boxes to record "summary conclusions derived from the evidence in the file" and contains four subsections regarding areas of function:  understanding and memory, sustained concentration and persistence, social interaction, and adaptation.  (AR 492-93.)  Each subsection contains categories of skills and abilities the physicians is to check-mark as "not significantly limited," "moderately limited," "markedly limited," "no evidence of limitation in this category," or "not ratable on available evidence."  Section II provides space for the physician to document any needed additional documentation.  (AR 493.)  Finally, Section III is for the physician to record a functional capacity

assessment only after Section I is completed, and it is to include any additional information which clarifies the claimant's limitation or function.  (AR 494.)   The Social Security's Program Operations Manual System ("POMS") directs adjudicators to Section III of the MRFC form, rather than Section I.  POMSDI24510.060(B)(4), available at https://secure.ssa.gov/poms. nsf/lnx/0424510060.  POMS states that Section III contains the "actual mental RFC assessment is recorded, explaining the conclusions indicated in [S]ection I, in terms of the extent to which these mental capacities or functions could or could not be performed in work settings."   DI 24510.060(B)(4); *see Nathan v. Colvin*, No. 12-35797, 551 Fed. Appx. 404, 408 (9th Cir. 2014) (unpublished) (Section I of the MRFC does not contain the physician's RFC opinion and ALJ properly considered only Section III narrative opinion of MRFC form).

Dr. Ferguson completed Section I by checking boxes indicating Plaintiff was "moderately limited" in several categories, such as the ability to understand, remember, and carry out detailed instructions, the ability to maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted by them, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavior extremes, and respond appropriately to changes in the work setting.  (AR 492-93.)  In Section III, Dr. Ferguson opined that Plaintiff *retained* the ability to understand and remember detailed instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in routine work settings.  (AR 494.)

Plaintiff contends the moderate limitations noted in Section I of Dr. Ferguson's MRFC form should have been included in the ALJ's RFC, but the ALJ failed to explain the weight given to Dr. Ferguson's opinion and why these moderate adaptation limitations were rejected.  Dr. Ferguson's narrative description of Plaintiff's limitations in Section III indicates Plaintiff retained the ability to attend and concentrate for extended periods and respond appropriately to changes in a work setting.  (AR 494.)  It is this narrative that is to be given weight, according to POMS, rather than the Section I check-boxed conclusions.  Thus, the ALJ's RFC limiting Plaintiff to simple, repetitive tasks with no public contact sufficiently incorporates Dr. Ferguson's narrative

1   opinion in Section III of his MRFC.  Even if the ALJ erred in failing to give express consideration

2   to Dr. Ferguson's January 31, 2011, MRFC form opinion, the error was harmless because the RFC

3   reflected the abilities Dr. Ferguson provided in Section III of the MRFC form.

4       **2.      The Limitations Opined by Dr. DiGiaro**

5       Plaintiff contends the ALJ's RFC failed to include Dr. DiGiaro's opinion that Plaintiff was

6   moderately limited in her ability to maintain attendance, complete a normal workday without

7   interruptions from a psychiatric condition, and deal with stress.  Plaintiff maintains POMS defines

8   the mental abilities needed for any job which includes the ability to maintain attention for

9   extended periods, maintain regular attendance, complete a normal workday and workweek without

10  interruptions from psychologically based symptoms, and respond appropriately to changes in a

11  routine work setting.   POMS 25020.010(B)(3).   Because Dr. DiGiaro opined Plaintiff had

12  limitations in these areas, those limitations necessarily impacted Plaintiff's ability to perform the

13  alternative work identified by the VE.  Plaintiff also cites *Brink v. Comm'r Soc. Sec. Admin.*,

14  343 Fed. Appx. 211, 212 (9th Cir. 2009) (unpublished), arguing the Ninth Circuit remanded that

15  case based on similar facts presented here.

16      The Commissioner argues that the moderate limitation opined by Dr. DiGiaro was

17  incorporated into the RFC by including the limitation to simple, repetitive tasks without any public

18  contact and only occasional interaction with coworkers and supervisors.  The Commissioner also

19  concludes that Plaintiff's reliance on *Brink* is "misplaced."

20      The ALJ is required to formulate the RFC based on the entire record.   20 C.F.R.

21  § 1545(a)(3) (the RFC is based on all the relevant evidence, including diagnoses, treatment,

22  observations, and opinions of medical sources, as well as observations by family members and the

23  claimant's own subjective symptoms).  The RFC findings need only be consistent with the relevant

24  assessed limitations and not identical to them.  *See Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217,

25  1222-23 (9th Cir. 2010).

26      Here, the ALJ credited the opinions of Dr. DiGiaro, state agency examining physician and

27  state agency non-examining physician Dr. Aquino-Caro.  (AR 19.)  Dr. Aquino-Caro opined in

28  April 2013 that Plaintiff had moderate limitations in several areas of Section I on the MRFC form,

1   but in narrative form, indicated the moderate limitations noted did not preclude Plaintiff from the

2   ability to complete simple, repetitive tasks with limited public contact.  (AR 156-58.)  Although

3   Dr. DiGiaro noted moderate limitations in the ability to maintain regular attendance, complete a

4   normal workday, and deal with stress, she too opined Plaintiff was able to perform simple,

5   repetitive tasks.  (AR 598.)  The ALJ may synthesize these opinions in creating the RFC, and there

6   is no indication the ALJ failed to include a moderate limitation either of the doctors felt could not

7   be encompassed by a limitation to simple, repetitive tasks with limited contact with supervisors,

8   co-workers, and the public.

9        Plaintiff's citation to *Brink*, an unpublished Ninth Circuit memorandum decision, for the

10  proposition that the simple, repetitive task limitation does not encompass moderate functional

11  limitations such as concentration, persistence, and pace is not persuasive.  In *Brink*, the ALJ

12  apparently accepted medical evidence that the claimant had moderate difficulty maintaining

13  concentration, persistence, or pace.  However, the ALJ did not include this moderate limitation in

14  posing a hypothetical to the VE and only referenced a limitation for simple, repetitive work.  The

15  court held this was error and rejected the Commissioner's contention that the limitation to simple,

16  repetitive work encompassed the claimant's difficulties with concentration, persistence, and pace.

17  *Id.*  The court distinguished *Stubbs-Danielson v. Astrue*, 539 F.3d 1169 (9th Cir. 2008), which

18  reached the opposite conclusion, reasoning that in *Stubbs-Danielson* there were no established

19  limitations in concentration, persistence, or pace whereas in the case before it, *Brink*, there was

20  evidence of such limitations.  The court concluded *Stubbs-Danielson* was therefore inapposite.  *Id.*

21       The reasoning offered in *Brink* to distinguish *Stubbs-Danielson* is not persuasive.  In

22  *Stubbs-Danielson*, two doctors opined the claimant had limitations in pace:  Dr. McCollum

23  determined Plaintiff had "slow pace, both with thinking and her actions" and found the claimant

24  "moderately limited" in the ability to perform at a consistent pace without an unreasonable number

25  and length of rest periods; Dr. Eather also identified "a slow pace, both in thinking & actions."

26  *Stubbs-Danielson*, 539 F.3d at 1173.  The *Stubbs-Danielson* court concluded, however, that the

27  pace limitations were adequately translated into the only "concrete restrictions available" which

28  was a restriction to simple tasks that matched the conclusion of Dr. Eather.  *Id.* (citing *Howard v.*

1  *Massanari*, 255 F.3d 577, 582 (8th Cir. 2001)).   Distinguishing *Stubbs-Danielson* on the ground

2  that there was no evidence of functional limitation in concentration, persistence, and pace is not

3  persuasive, and, as an unpublished memorandum decision, *Brink* is not controlling authority.

4        Here, Dr. DiGiaro opined Plaintiff had moderate limitations in the ability to attend work,

5  complete a normal workweek, and deal with stress in a workplace, but nonetheless concluded

6  Plaintiff would be able to perform simple and repetitive tasks.   This matched Dr. Ferguson's

7  conclusions that, despite moderate limitations in concentration and her ability to deal with stress,

8  Plaintiff ultimately maintained adequate abilities in these areas.   Dr. Aquino-Caro found Plaintiff

9  had *no* adaptation limitations.   (AR 158.)   Thus, the ALJ's RFC was a combination of Drs.

10  Ferguson, DiGiaro, and Aquino-Caro's opinions, which he synthesized in creating the RFC.

11  Moreover, like *Stubbs-Danielson*, the ability to do simple, repetitive work adequately captures

12  moderate deficiencies in certain adaptation abilities where, as here, the examining and non-

13  examining physicians DiGiaro, Ferguson, and Aquino-Caro all opined Plaintiff retained the ability

14  to perform simple, routine tasks despite any moderate limitations in adaptation abilities noted by

15  Dr. DiGiaro and Ferguson.

16  **B.**      **The ALJ's Consideration of Plaintiff's Symptom Testimony**

17        Plaintiff notes the ALJ rejected her symptom testimony based on her daily activities and

18  lack of compliance with medical treatment, which Plaintiff contends were legally insufficient

19  reasons.   The Commissioner argues the reasons stated by the ALJ were proper, and the ALJ's

20  credibility determination should be upheld.

21        **1.**      **Legal Standard**

22        In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ

23  must engage in a two-step analysis.   *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).   First,

24  the ALJ must determine whether the claimant has presented objective medical evidence of an

25  underlying impairment that could reasonably be expected to produce the pain or other symptoms

26  alleged.   *Id.*   The claimant is not required to show that her impairment "could reasonably be

27  expected to cause the severity of the symptom she has alleged; she need only show that it could

28  reasonably have caused some degree of the symptom."   *Id.* (quoting *Lingenfelter*, 504 F.3d at

1036).  If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the rejection.  *Id.*  As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (citations and internal quotation marks omitted); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009); 20 C.F.R. §§ 404.1529, 416.929.  Other factors the ALJ may consider include a claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains.  *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

### 2. Analysis

#### a. The ALJ Properly Considered Plaintiff's Daily Activities

Plaintiff first contends the ALJ's assessment of her daily activities as inconsistent with her symptom testimony is improper. The activities Plaintiff performs are not transferrable to the workplace, and the ALJ provided no analysis how her daily activities are transferrable to the workplace.  The Commissioner argues Plaintiff's daily activities are not offered by the ALJ to show Plaintiff's ability to perform sustained work activity, but were noted instead because they bear on Plaintiff's believability: Plaintiff alleges a degree of incapacity incompatible with the activities in which she engages.

There are two recognized grounds for using daily activities to form the basis of an adverse credibility determination:   the activities contradict other testimony; or the activities meet the threshold for transferable work skills.  *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (citing *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).  When the ALJ uses daily activities to show the claimant maintains activities that meet the threshold for transferable work skills, the ALJ must

1    make specific findings that the claimant is able to spend a substantial part of his day engaged in

2    pursuits involving performance of physical functions that are transferable to a work setting.  Thus,

3    in *Orn*, the court rejected the Commissioner's argument that reading, watching television, and

4    coloring in coloring books were activities that bore a meaningful relationship to the activities of

5    the workplace.  *Id.*

6        Here, the ALJ noted Plaintiff's daily activities in relation to the first ground: that the

7    activities were inconsistent with her statements of limitation.  (AR 20.)  Even where activities of

8    daily living suggest some difficulty functioning, they may still be grounds for discrediting the

9    claimant's testimony to the extent they contradict claims of a totally debilitating impairment.

10   *Turner*, 613 F.3d at 1225; *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir.

11   2009).   Thus, whether Plaintiff's daily activities were transferable to a workplace setting is

12   irrelevant to the reasoning offered by the ALJ.   The question is whether there is substantial

13   evidence to support the inconsistencies between Plaintiff's activities and her allegation of totally

14   disabling impairment noted by the ALJ.

15       Plaintiff testified at the hearing she is primarily precluded from work because of her

16   inability to "deal with people."  (AR 47.)  She cannot control her temper, ends up crying, and

17   running away.  (AR 47.)  She also experiences regular panic attacks, which triggers her to "want to

18   hide and find a safe place to be."  (AR 50.)  She states she experiences headaches three times a

19   week, which last a couple of hours with medication and occur about two to three times per week.

20   (AR 52.)  She also has pain in her neck, which runs through the back of her head; and she has pain

21   in her wrists and hip joints.   (AR 53.)   On an average day, she wakes, takes her thyroid

22   medication, spends time with her dog, watches some television, takes a nap, and does as little as

23   possible.  (AR 57.)

24       Yet, the wide breadth of her reported daily activities could be reasonably construed as

25   inconsistent with the degree of limitation she reported.   As the ALJ noted, Plaintiff reported

26   visiting with friends, taking care of her small dog, preparing simple meals, and shopping one- to

27   two-times per month.   She reported to Dr. DiGiaro that she took care of her own grooming,

28   performed light shopping, cooking, and laundry.  Plaintiff also testified she does light house work,

cleans the bathroom, goes to church occasionally, visits friends, and sees her counselor once a week.  Thus, there is substantial evidence the ALJ could reasonably interpret as inconsistent with the degree of limitation to which Plaintiff claimed.

**b.      The ALJ Permissibly Considered Plaintiff's Failure to Appear for Treatment**

In making an adverse credibility determination as to Plaintiff's lay testimony, the ALJ noted Plaintiff failed to follow through with mental health treatment appointments.  (AR 20.)  She cancelled for failed to show up for appointments to treat her depressive disorder and anxiety at Tulare County Mental Health and was discharged due to non-compliance.  He concluded this failure to follow through with treatment undermines the credibility of her subjective reports of her symptoms.  (AR 20.)

Plaintiff contends the ALJ impermissibly considered her failure to appear for treatment sessions as a basis for the adverse credibility determination.  Plaintiff's failure to attend various medical appointments is a feature of her mental condition and not a proper basis to discount her credibility.  (Doc. 13, 14:20-15:4 (citing, *e.g., Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996).)  The Commissioner argues the ALJ's credibility analysis was proper.  Specifically, the ALJ is permitted to consider a failure to attend treatment appointments in assessing credibility.

On the one hand, in making a credibility determine, an ALJ may consider a claimant's unexplained or inadequately explained failure to seek treatment or comply with a treatment regime.  *Tommasetti*, 533 F.3d at 1039.  According to Agency rules, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure."  Social Security Ruling ("SSR") 96-7p.  On the other hand, in cases of mental impairment, it may be inappropriate to place too much emphasis on a failure to follow treatment or seek treatment where there is evidence the failure to do so was a feature of the impairment itself.  *See Molina v. Astrue*, 674 F.3d 1104, 1113-14 (9th Cir. 2012).

In *Molina*, the court found it was permissible for the ALJ to consider an unexplained lack of treatment where the claimant reportedly suffered from an anxiety disorder. 674 F.3d 1104. The court explained that the record was "filled with evidence" that despite the claimant's physician's repeated efforts to persuade the claimant to seek psychiatric treatment, she failed to do so until after she applied for disability benefits. *Id.* "Although Molina provided reasons for resisting treatment, there was no medical evidence that Molina's resistance was attributable to her mental impairment rather than her own personal preference, and it was reasonable for the ALJ to conclude that the 'level or frequency of treatment [was] inconsistent with the level of complaints.'" *Id.* The court noted Molina's reliance on *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) was misplaced because there the "'evidence overwhelmingly demonstrate[d] Pate-Fire's noncompliance was attributable to her mental illness,'" whereas there was no such evidence before the court in *Molina*. *Id.*

This case similar to *Molina* in that, although Plaintiff suggests, without expressly asserting, her failure to attend the medical appointments related to her mental health was due to her mental health, the record does not corroborate Plaintiff's contention in this regard. Instead, the record shows Plaintiff repeatedly failed to attend therapy and counseling sessions to the extent she was discharged from treatment in February 2014 at Tulare County Mental Health because of her no-shows. (AR 823-24.) Tulare County Mental Health noted Plaintiff had missed follow-up visits for medical appointments, rehabilitation appointments, and therapy appointments on November 19, 2013, December 9 and 30, 2013, and January 28 and 31, 2014. (AR 823.) She was dismissed from treatment on February 12, 2014. (AR 824.) Plaintiff does not cite, nor does the record reflect, a medical notation that these absences were due to her mental health condition. As such, the ALJ was permitted to consider this unexplained failure to follow her mental health treatment regime in making the credibility determination. *Molina*, 674 F.3d at 1113-14.

### c.    Secondary Motives Were Properly Considered by the ALJ

The ALJ also gave less weight to Plaintiff's lay statements because the record suggested Plaintiff was seeing physicians primarily in order to generate evidence for her social security application. (AR 20.) Plaintiff does not make any contention of error as to this reasoning, and the

Commissioner argues secondary motives, rather than actual disability from impairments, is a factor that is permissibly considered by the ALJ.  (Doc. 14, 12:8-27 (citing, *e.g., Matney v. Sullivan*, 981 F.2d 1016, 1021 (9th Cir. 1992).)  At appointments in 2010 and 2012, the ALJ noted Plaintiff mentioned her disability applications were pending (AR 382, 620), and in April 2013, the first time she was examined by Dr. Kissinger, she requested he complete a disability form to assist with her application for benefits.  (AR 811.)

Plaintiff does not allege any error regarding this reasoning, and there is substantial evidence to support the inference made by the ALJ regarding Plaintiff's motivation to seek treatment.

> **d.     Plaintiff's Medication Non-Compliance Is Not Supported by Substantial Evidence**

As for Plaintiff's medication compliance, the ALJ found there was evidence Plaintiff had not been entirely compliant in taking prescription medication.  (AR 20.)  For example, on January 6, 2010, she reported to her treating provider that she had not taken her prescribed Seroquel, and she was out of her Paxil medication.  (AR 574.)  Her medications were refilled on January 29, 2010, but she was unable to refill them on February 10, 2010, because she had no money.  (AR 574.)  Although she indicated she would return, she was a no-show for her appointment on March 30, 2010.  (AR 574.)  She also failed to appear for an appointment on May 3, 2010 (AR 573), but was seen the next day on May 4, 2010 (AR 572.)  At that appointment, Plaintiff reported she had stopped taking the Seroquel because she did not like that she was eating all the time.  (AR 573.)

On November 1, 2010, Plaintiff was evaluated at Denton County, Texas, MHMR Center upon reporting anxiety and depression.  (AR 530-37.)  She stated she had previously been prescribed Paxil and Seroquel, but neither of those medications worked for her.  (AR 530.)  Plaintiff was prescribed Prozac, Restoril, Buspar, and Levoxyl (AR 541), which she reported on November 18, 2010, had decreased her symptoms (AR 396.)  She reported on November 24, 2010, she was taking her medication as prescribed, and it was noted she was clinically improving.  (AR 442-43.)  On December 21, 2010, she again reported to her treating physician at Denton

County MHMR that she was taking her medication as prescribed (AR 504), and it was noted that she was stable beyond being upset with her daughter who had stolen money from her (AR 505).

The ALJ noted that Plaintiff's anxiety and symptoms appeared to improve while she was consistent with her medication and cites Plaintiff's treatment records from Denton County MHMR. While it is true that Plaintiff's condition appeared to improve when her medication was modified in November 2010, the evidence noted by the ALJ supporting that Plaintiff was not compliant taking her medication is limited to only one notation in January 2010 when Plaintiff reported she had not taken her Seroquel.  (AR 574.)  Plaintiff later reported, however, that she had stopped taking the Seroquel due to side effects and ineffectiveness.  (AR 573.)  There is little evidence Plaintiff refused to take her medication, and the ALJ's reasoning in this regard is not clear and convincing.    Nonetheless, the ALJ offered other clear and convincing reasons to discredit Plaintiff's symptom testimony, thus the ALJ's error in this regard is harmless.  *See Carmickle v. Comm'r Soc. Sec. Admin*., 533 F.3d 1155, 1163 (9th Cir. 2008) (one erroneous basis to reject credibility does not necessarily "negate the validity" of the ALJ's adverse credibility finding).

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and based on proper legal standards. Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Carolyn Colvin, Acting Commissioner of Social Security and against Plaintiff Linda Elaine Calisti.

IT IS SO ORDERED.

Dated:   **November 20, 2015**                                   **/s/ Sheila K. Oberto**
                                                       UNITED STATES MAGISTRATE JUDGE